IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 7, 2017

**STATE OF TENNESSEE v. REGGIE HORTON**

**Appeal from the Criminal Court for Shelby County**
**No. 16-04141     W. Mark Ward, Judge**

_____

**No. W2017-00676-CCA-R3-CD**

_____

The defendant, Reggie Horton, appeals his Shelby County Criminal Court jury convictions of attempted voluntary manslaughter, aggravated kidnapping, and simple assault, claiming that the trial court erred by admitting certain evidence and that the evidence was insufficient to support his conviction of aggravated kidnapping. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Harry E. Sayle III (on appeal) and Robert Felkner (at trial), Assistant District Public Defenders, for the appellant, Reggie Horton.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Danielle McCollum and Jamie Kidd, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In July 2016, the Shelby County Grand Jury charged the defendant with one count of attempted first degree murder, two counts of especially aggravated kidnapping, three counts of aggravated kidnapping, and two counts of aggravated assault. Prior to trial, the State dismissed one count of especially aggravated kidnapping, two counts of aggravated kidnapping, and one count of aggravated assault. The trial court conducted a jury trial on the remaining counts in October 2016. The trial related to events that occurred on April 27, 2015.

The State's proof at trial showed that Tokisha Craig had three children with the defendant over the course of their 11-year relationship. In 2012, shortly before becoming pregnant with her youngest child, K.H.,[1] Ms. Craig met Kristen Franklin[2] at work. Approximately one year later, Ms. Craig's friendship with Ms. Franklin transformed into a romantic relationship, although Ms. Craig was still involved in a romantic relationship with the defendant as well. "Not too long" after Ms. Craig began seeing Ms. Franklin, the defendant learned of the relationship and "didn't like it." Although Ms. Craig was initially conflicted, she and her children later moved in with Ms. Franklin in November 2014. The defendant "didn't feel like his kids should be growing up with two women," and he referred to Ms. Franklin as a "dyke."

Ms. Craig and the defendant did not have a formal agreement as to custody and visitation; instead, Ms. Craig would bring the children to the defendant "[w]henever he called and said that he wanted" them. Initially, the defendant requested to spend every weekend with the children, but as time passed, he would make plans to see the children but would fail to pick them up as planned.

On a date in early January 2015, the defendant visited Ms. Craig and the children at the residence they shared with Ms. Franklin, but Ms. Franklin was not at home during the defendant's visit and was unaware of the visit. After the defendant left, Ms. Franklin returned to the residence. Later that day, the defendant sent text messages to Ms. Franklin containing photographs of the interior of her residence and stating that he "had your b[****] last night." Ms. Franklin responded that she "hope[d he] enjoyed seeing [his] kids for the last time." The two continued to taunt one another via text messaging, with Ms. Franklin referring to the defendant as a "deadbeat." Ms. Franklin insisted, however, that she had never attempted to keep the children away from the defendant.

Later that same evening, the defendant returned to the parking lot of Ms. Franklin's residence, proclaiming that "[n]obody's going to take [his] kids away from [him]." Ms. Craig attempted to reassure the defendant, but the defendant continued to angrily argue with Ms. Craig. At Ms. Craig's suggestion, Ms. Franklin returned to the residence and locked the front door while Ms. Craig attempted to convince the defendant to calm down.

---

[1]     As is the policy of this court, we refer to minors by their initials.

[2]     In the indictment, Ms. Franklin's first name is spelled "Kristian." Although the indictment was never amended, Ms. Franklin spelled her name as "Kristen" at the outset of her testimony in both the 404(b) hearing and the trial. We will thus honor the spelling provided by Ms. Franklin in the underlying proceedings.

The defendant then kicked open both the front door of the residence and the locked master bathroom door, and he began choking and punching Ms. Franklin while threatening to kill her. Ms. Craig was initially successful in pulling the defendant away from Ms. Franklin, but in the process, Ms. Craig fell, and the defendant started toward Ms. Franklin again. At that time, Ms. Craig pushed the panic button of their alarm system, and the defendant fled. As a result of the attack, Ms. Franklin sustained cuts to her neck and forehead, and photographs of her injuries, as well as a photograph of the broken bathroom door, were entered into evidence.

Ms. Craig continued to permit the defendant to visit the children, and the defendant continued to urge Ms. Craig to reconcile with him. To that end, he purchased an engagement ring for Ms. Craig in February, but she did not accept his proposal of marriage.

On April 27, 2015, the defendant sent Ms. Craig a text message requesting that she and the children meet him to celebrate his birthday, and Ms. Craig responded that she was unavailable. Later that same morning, Ms. Craig and Ms. Franklin, along with 16-month-old K.H., patronized David's Bridal shop for Ms. Franklin to select a bridesmaid dress for a friend's wedding. As the trio exited the store, the defendant rushed toward them wielding a knife and accusing Ms. Craig and Ms. Franklin of planning to marry each other while exclaiming, "I'm going to kill y'all." Ms. Craig attempted to calm the defendant, but he swung the knife in Ms. Craig's direction, cutting her arm and her handbag. The defendant then pushed Ms. Craig out of the way and began attacking Ms. Franklin, stabbing her in the back, nose, neck, and fingers while exclaiming that he would kill Ms. Craig when he finished killing Ms. Franklin. Ms. Craig attempted to pull the defendant away from Ms. Franklin and, in the scuffle, the women were able to extricate the knife from the defendant's hand and fling it away; Ms. Craig's hand was cut in the process of disarming the defendant. Through the testimony of Ms. Franklin, the State introduced into evidence photographs of blood stains in the David's Bridal parking lot, Ms. Franklin's blood-stained clothing, and Ms. Franklin's injuries, including a scar several inches in length on her neck.

After stabbing Ms. Franklin, the defendant grabbed Ms. Craig by her arm and hair and dragged her to his truck, causing her pain and causing her to lose her shoes and her eyeglasses in the process. When Ms. Craig was unable to initially enter the vehicle due to an unrelated ankle injury, the defendant punched her in the back and in the head, again causing her pain, before lifting her into the backseat of the truck and placing her on her stomach. The defendant then positioned his seat in such a way that Ms. Craig was unable to move, and he shut the door. The defendant returned to K.H., who was crying and leaning over Ms. Franklin. He picked up K.H. and placed her in the backseat of the truck next to Ms. Craig and quickly drove away.

Rachel Cummings, an employee of David's Bridal, was sitting in her vehicle at 2:30 p.m. in the parking lot waiting for her shift to start when she heard a woman screaming. Ms. Cummings got out of her vehicle and saw a "very tall African American man" grab a woman by her hair and drag the woman toward his truck. Ms. Cummings saw the man throw the woman into the backseat of the truck, and he began beating the woman. Ms. Cummings begged the defendant to stop, but he told her to "[s]top interfering" as he continued to "beat[] this woman within an inch of her life." Ms. Cummings called 9-1-1 to report the assault and told the defendant that the police were on their way. At that point, the defendant grabbed K.H. and "threw her in the car like she was a football and he closed the door, forcefully" before "sp[eeding] off as fast as he could."

Ms. Cummings, who was still on her cellular telephone with the 9-1-1 operator, was walking into the bridal store when she noticed Ms. Franklin lying on the ground. Ms. Cummings could see that she had been stabbed in the neck and saw a bloody knife on the ground. The people who were surrounding Ms. Franklin stated that she had been stabbed, and Ms. Cummings relayed this information to the 9-1-1 operator and requested an ambulance.

Laura Tellez, an employee of Travel Leaders, testified that her place of business was located next door to David's Bridal. On April 27, as she was seated at her desk in front of a large window, she saw "a large black man attacking a smaller black female." She immediately called 9-1-1 to report the assault.

Shaundra Shaw was waiting to book a trip at Travel Leaders when she heard a commotion. She stepped outside and saw a man, whom she positively identified in court as the defendant, dragging a woman toward his truck. Ms. Shaw witnessed the defendant push Ms. Craig into his truck and throw K.H. into the truck "like she was a bag of potatoes." Ms. Shaw saw a bystander attempt to stop the defendant and overheard the defendant telling the woman to "mind her F'ing business" before speeding away. Ms. Shaw also saw Ms. Franklin, who was bleeding profusely with deep "gashes in her neck."

Jessica Schaedle testified that she was in the parking lot of the shopping center where David's Bridal was located when she saw a man dragging a woman by the hair toward his truck. Ms. Schaedle noticed that the woman lost her shoes and her eyeglasses during the struggle. Ms. Schaedle got out of her vehicle to ask the man what he was doing and to record his license plate number, and the man told Ms. Schaedle to "stay out of this" before throwing K.H. into his vehicle and driving away. After the man left, Ms. Schaedle noticed Ms. Franklin and saw that she was covered in blood.

Memphis Police Department ("MPD") Officer Carlos Castillo responded to a call of a "wounding" at David's Bridal and, upon his arrival, he found Ms. Franklin already loaded into an ambulance. From speaking with Ms. Franklin at the scene, Officer Castillo issued a broadcast with the defendant's name and a description of his truck.

After speeding away from the David's Bridal parking lot, the defendant proceeded directly to a motel. He parked the truck in front of the motel office and left Ms. Craig and K.H. locked in the truck with the childproof locks engaged. A few minutes later, the defendant returned to the truck and parked it in front of his motel room, assisting Ms. Craig out of the backseat while yelling that Ms. Craig "had caused all of this and . . . was lying to him" and that she "shouldn't want [her] kids to be raised by – with a woman." The defendant warned Ms. Craig "not to make [a] scene" and brought Ms. Craig and K.H. into the motel room.

The defendant barricaded the motel room with the television stand and a desk. He eventually apologized to Ms. Craig for his behavior, but he would not permit her or K.H. to leave. Ms. Craig, a diabetic, began to feel ill because her blood sugar level had risen and she had no access to her medication or food, which caused her to fall asleep. When she awoke sometime later, the defendant was watching the news on television, and Ms. Craig overheard the television reporter saying that Ms. Franklin was in critical condition at the hospital and that the schools attended by Ms. Craig's other children had been placed on lockdown.

MPD Sergeant Zachary Gatlin assisted with the search for and capture of the defendant. Knowing the defendant's name and a description of his vehicle with Arkansas tags, authorities focused their search on hotels located on Interstate 40 heading toward Arkansas. Their search led them to a Motel 6 where they located the defendant's vehicle. After establishing a perimeter, officers identified the defendant standing outside of a motel room and talking on his cellular telephone. The defendant apparently spotted the officers and retreated into his room. When Sergeant Gatlin approached the motel room door, he heard the defendant yell "that he was going to kill [Ms. Craig] if [the police] came in the room," and Sergeant Gatlin heard "a girl crying and yelling and a baby." Through the closed door, Sergeant Gatlin began a conversation with the defendant, and after approximately two hours of negotiations and permitting the defendant to speak with family members, the defendant peacefully surrendered and was placed under arrest.

Doctor Shaun Stickley testified as an expert in the field of vascular surgery. Doctor Stickley was called in specifically to evaluate Ms. Franklin's carotid artery when she had been prepped and was awaiting surgery. Doctor Stickley reviewed Ms. Franklin's Computed Tomography ("CT") scans and determined that "there was air

around the carotid artery and there was an irregularity to the contour of the blood vessel." Doctor Stickley explained that the presence of the irregularity caused concern that a blood clot could travel to Ms. Franklin's brain and cause a stroke. Based on Doctor Stickley's evaluation, he estimated that the knife came within one to two centimeters of Ms. Franklin's carotid artery.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant chose to testify and present proof.

The defendant testified that, in January 2015, he and Ms. Craig had been discussing a reconciliation. The defendant admitted that he had texted Ms. Franklin photographs of the interior of her apartment because he was upset that Ms. Craig "was playing games with both" him and Ms. Franklin and that he wanted to prove to Ms. Franklin that he was not a "deadbeat dad" and that he did visit his children. The defendant stated that he and Ms. Craig continued to see each other every day between the January incident at the apartment and April 27.

On the morning of April 27, the defendant was waiting for Ms. Craig at a park. When Ms. Craig did not arrive as scheduled, the defendant attempted to reach her by telephone, but Ms. Craig did not answer. The defendant then drove to her apartment and saw a car which he believed Ms. Craig was driving leaving the apartment complex. The defendant followed her. When he saw Ms. Craig and Ms. Franklin enter David's Bridal, he became upset; he claimed that he had been unaware that Ms. Franklin was in the car. He approached the pair in the parking lot, and although he did not recall "exactly what was said," he remembered that Ms. Franklin "said something that got [him] riled." According to the defendant, he and Ms. Franklin "got to tussling" with the pocket knife he always carried with him, and, as a result, Ms. Franklin "ended up getting cut."

The defendant then took Ms. Craig by the arm, "carried her to the truck," and "[p]ut her in the truck." Because he was unaware that her ankle was injured, he "started shoving her in the truck." When asked what he had intended by taking Ms. Craig from the scene, he offered that he was seeking "some kind of closure" and that he simply wished to "[j]ust talk to her." He explained that he put K.H. into the vehicle because she was his daughter, and he "couldn't just leave her there."

The defendant testified that Ms. Craig was free to leave the motel at any time and that she never once asked to leave. He explained that he did not initially leave the motel room upon the arrival of police officers because he "was afraid . . . [o]f what might happen," and he didn't know if the officers were "going to shoot" him. The defendant stated that his actions had been affected by Ms. Craig's romantic relationship

- 6 -

with Ms. Franklin because he believed two women raising children together was "wrong." The defendant also acknowledged that, eight years prior, he had been convicted of aggravated burglary.

On cross-examination, the defendant admitted that, following his January text exchange with Ms. Franklin, he had kicked in the doors in her apartment, attempted to strangle her, and fled because the panic alarm had been activiated.

With respect to the events of April 27, the defendant admitted that he watched Ms. Craig and Ms. Franklin enter David's Bridal, that he waited while they were inside the store, and that he approached them when they left the store. The defendant denied swinging a knife at the women as he approached them, but he acknowledged that Ms. Craig had cut her hand when she grabbed the knife. The defendant conceded that he had stabbed Ms. Franklin multiple times and admitted that Ms. Franklin had attempted to flee from him but that he had pulled Ms. Franklin down by her backpack. The defendant claimed that he was unaware that he was holding his knife until he had already stabbed Ms. Franklin several times. The defendant denied beating Ms. Craig and testified that the witnesses who had claimed otherwise were lying.

Based on this evidence, the jury convicted the defendant of the lesser included offenses of the attempted voluntary manslaughter of Ms. Franklin and the misdemeanor assault of Ms. Craig and convicted the defendant as charged of the aggravated kidnapping of Ms. Craig. The jury found the defendant not guilty of the especially aggravated kidnapping of K.H. Following a sentencing hearing, the trial court sentenced the defendant as a multiple offender to a term of eight years' incarceration, to be served concurrently with the defendant's sentence of 11 months and 29 days for his conviction of simple assault. With respect to the aggravated kidnapping conviction, the trial court sentenced the defendant as a multiple offender to a term of 20 years' incarceration to be served at 100 percent by operation of law and to be served consecutively to his sentence for attempted voluntary manslaugher for a total effective sentence of 28 years.

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by admitting certain evidence at trial and that the evidence adduced at trial was insufficient to support his conviction of aggravated kidnapping. We will consider each claim in turn.

## I.    *Evidence of Prior Bad Acts*

The defendant first contends that the trial court erred by admitting evidence of his January 2015 attack on Ms. Franklin because it was impermissible propensity evidence.  We disagree.

Prior to trial, the trial court conducted a hearing in which both Ms. Craig and Ms. Franklin testified to the events of early January 2015.  The witnesses' testimony at the hearing was substantially similar to their trial testimony regarding the defendant's text exchanges with Ms. Franklin; his arrival at their apartment complex and rants about being told that he could not see his children; and his subsequent actions of kicking in the front door and the bathroom door and choking Ms. Franklin before fleeing at the sound of the panic alarm.

At the hearing, Ms. Craig also testified that, during the time in which she was attempting to calm the defendant in the parking lot, the defendant struck her on the side of the face, choked her, and pushed her away before charging toward the apartment and kicking in the front door.

Following the testimony of Ms. Craig and Ms. Franklin, the trial court ruled that their testimony was credible and that the evidence of the defendant's actions was "clear and convincing."  Citing *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993), the court found that a "material non-propensity purpose" existed with respect to the defendant's violence toward Ms. Franklin "to show the defendant's hostility toward the victim, malice[,] intent, and [settled] purpose to harm" her and that the prior incident was "extremely relevant."  The court ruled that the probative value of the evidence was "high" because the similarity of the prior attack on Ms. Franklin to her attempted murder supported the defendant's intent to harm her and that the strength of the probative value outweighed the prejudicial impact.  The trial court disallowed proof of the prior assault of Ms. Craig, however, because the charges against the defendant related to his April 27 treatment of Ms. Craig were "general intent crimes" and the prejudicial effect of introducing evidence of the prior assault outweighed its probative value.

On appeal, the defendant argues that the minimal probative value of the January attack on Ms. Franklin was outweighed by its prejudicial impact and that the defendant's intent "was amply provided by testimony of multiple witnesses."  The State responds that, because it was required to prove the element of intent in attempted first degree murder, evidence of the prior attack on Ms. Franklin was highly probative to combat the defendant's claim that he was unaware he was holding the knife during the April attack until he had already begun stabbing Ms. Franklin and that evidence of the prior assault evinced the defendant's settled purpose to harm Ms. Franklin.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Tenn. R. Evid. 403.

Generally speaking, "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Tenn. R. Evid. 404(a). This rule is subject to certain exceptions, however, including "evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same." Tenn. R. Evid. 404(a)(1). In addition, "[e]vidence of other crimes, wrongs, or acts" may be admissible for "other purposes," such as proving identity, criminal intent, or rebuttal of accident or mistake. Tenn. R. Evid. 404(b); *State v. Thacker*, 164 S.W.3d 208, 239-40 (Tenn. 2005). To admit such evidence, the rule specifies four prerequisites:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

Tennessee courts have accepted the use of evidence of a homicide defendant's threats or prior violent acts directed toward the homicide victim as a means of allowing the State the opportunity to establish intent, theorizing that such evidence is probative of the defendant's mens rea at the time of the homicide because it reveals a "settled purpose" to harm the victim. *See Smith*, 868 S.W.2d at 574; *see also State v. Turnbill*, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982). Specifically, our supreme court has ruled that "[v]iolent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." *Id.*

In our view, evidence of the defendant's prior assault of Ms. Franklin fits squarely within the *Smith* rule. The evidence clearly and convincingly established the defendant's hostility toward and settled purpose to harm Ms. Franklin. Given the trial court's thorough compliance with the requirements of Rule 404(b), we find no abuse of discretion in that court's decision to admit the aforementioned testimony. Moreover, any error occasioned by the admission of this evidence would be harmless in light of the overwhelming proof of the defendant's guilt.

## II. Sufficiency

The defendant also contends that the evidence is insufficient to support his conviction of aggravated kidnapping because the only evidence of Ms. Craig's bodily injury was a cut to her arm that occurred prior to the defendant's attack on Ms. Franklin and, thus, was not incident to Ms. Craig's kidnapping. Again, we disagree.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither

re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a]ggravated kidnapping is false imprisonment, as defined in § 39-13-302: . . . [w]here the victim suffers bodily injury." T.C.A. § 39-13-304(a)(4). Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain . . . ." *Id.* § 39-11-106(a)(2).

In the instant case, the proof at trial established that the defendant dragged Ms. Craig by her hair and arm to his truck, and Ms. Craig testified that these actions caused her pain. Additionally, Ms. Craig testified that the defendant punched her in the back and in the head while forcing her against her will into his truck. Ms. Cummings, who witnessed this attack, testified that the defendant appeared to be beating Ms. Craig "within an inch of her life." Again, Ms. Craig testified that this beating caused her physical pain. Thus, the evidence sufficiently established that the defendant committed the offense of aggravated kidnapping. Although not raised by the defendant on appeal, we hold the evidence likewise supports the defendant's convictions of attempted voluntary manslaughter and simple assault.

*Conclusion*

Based upon the foregoing analysis, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE